McCarty and another *v.* Steam-Propeller City of New Bedford.

(*District Court, S. D. New York.*   November 30, 1880.)

1. Garnishment—Wages—Seamen.—The wages earned by a seaman, in the coastwise trade of the United States, are not subject to garnishment at the instance of the creditor of the seaman in an action at law brought in a state court.

2. Same—Same—Same—Jurisdiction.—The judgment of a state court, in such case, directing the garnishee to pay such wages to a creditor, is void for want of jurisdiction.

3. Same—Plea in Bar.—A garnishee cannot plead such judgment in bar, where it does not appear that execution has been awarded against him, or that he has been called on or compelled to pay the same.

In Admiralty.

*Alexander & Ash,* for libellants.

*Evarts, Southmayd & Choate,* for claimants.

Benedict, D. J.   This is a proceeding *in rem,* instituted by Daniel McCarty and Owen Hare, to enforce against the steam-propeller City of New Bedford a lien for their wages, earned in the navigation of that vessel in the coastwise trade of the United States, to-wit, in coastwise trade between the city of Fall River, in the state of Massachusetts, and the city of New York, by way of Narraganset bay, the Atlantic ocean, Long Island sound, the East river, and the waters of New York harbor.

The libel was filed in the southern district of New York on the twentieth day of February, 1880.   The Old Colony Steamboat Company intervened as claimants of the vessel, asserting that at the time of the filing of the libel the vessel was owned by them; and on March the 17th filed an answer to the libel, setting up in bar of the action that, on the twenty-fourth day of January, 1880, and the seventh day of February, 1880, the moneys in their hands then due the libellant Hare, and which had been earned by him in the navigation of the said steam-propeller, were in the city of Fall River attached by a constable of said city, by virtue of a writ issued out of the second

district court of the county of Bristol and state of Massachusetts, in an action commenced in said court, and then pending between George S. Eddy, as plaintiff, and said Hare as defendant.

In regard to the demand of the libellant McCarty similar matter is plead in bar, save only that in the suit against McCarty the attachment was served on the twenty-seventh day of February, and subsequent to the commencement of this proceeding.

Thereafter, and on the eighteenth day of May, the claimants filed a supplemental answer, wherein it was further averred that, upon the return of the said writ of attachment in the suit of Eddy against Hare, the plaintiff filed his declaration that the defendant owed him $50; that the Old Colony Steam-boat Company appeared in said suit as garnishee, and on the sixteenth day of February, 1880, filed their answer, claiming, as matter of law, that the wages of said Hare in their hands were exempt from attachment, and subsequently their additional answer, alleging the commencement of this proceeding by the libellant; that said Hare did not appear in said suit, and on the twelfth day of May it was adjudged by the said second district court that the said Eddy recover against the said Hare the sum of $50, and the Old Colony Steam-boat Company were charged on their answer with the payment to said Eddy of the amount earned by him from the company; that the said judgment still remains in full force and effect, and the said company has been and is thereby directed to pay to said Eddy, on account of the amount found due to him from said Hare, the entire amount of the wages which are claimed by him in this suit.

To this answer the libellants have excepted, upon the ground that the matters above stated are no bar to the present proceeding.

In regard to the wages of the libellant McCarty, the exception has been submitted to, the attachment having been served subsequent to the filing of the libel. In regard to the wages of the libellant Hare, the answer is insisted upon, and the court is now called on to determine its sufficiency.

The principal question thus presented is whether the wages earned by a seaman in the coastwise trade of the United States are subject to garnishment at the instance of a creditor of the seaman in an action at law brought in a state court. This question appears to have received little or no attention in the courts of this country, but is one deserving a careful examination. In most maritime countries such a question could not be deemed an open one. As early as the Consolato it was declared that against the wages of the seaman no creditor of the ship, nor any other person, can say anything or do anything; for the seamen must have their wages at the place where the master has promised to pay them. Consolato del Mare, c. 95; 2 Pard. Lois Maritime, 131. It was not to be expected that, in a compilation of such antiquity as the Consolato, the modern proceeding by garnishment would be mentioned in terms. But the language employed is broad enough to cover such a proceeding, and the principle declared is plainly inconsistent with the right of a creditor to divert the seaman's wages into his own pocket by means of the process of garnishment.

The principle declared in the Consolato, and thus made part of the law of the maritime world as then understood, appears to have taken the form of an authoritative order in France in the year 1748, (Caumont, Dict. Droit Mar. title "Gens de Mer," § 8, No. 19,) from which time to the present, as it is believed, the law of that great commercial nation has declared seaman's wages to be exempt from attachment at the suit of his creditor, except for debts of a certain character, and then only by virtue of express permission granted by official authority. The importance attached to this exemption in France is seen by its careful preservation during more than 100 years. In that country it is not even permitted to attach the wages of a seaman when deposited by him in a savings bank.

To the same effect has been the law of England, at least from the year 1728 up to the present time. The act of George II. c. 36, declares that the "payment of wages shall be good, valid in law, notwithstanding any action, bill of sale, attachment, or encumbrance whatsoever." While the act 17–18

Victoria, *c*. 104, § 233, provides that "no wages due or accruing to any seaman or apprentice shall be subject to attachment or arrestment from any court, and every payment of wages to a seaman or apprentice shall be valid in law, notwithstanding any previous sale or assignment of such wages, or any attachment, encumbrance, or arrestment thereon." I have not been able to find, either in the reports or the debates in parliament, any occasion calculated to give rise to this provision of the act of George II. at the time of its enactment. There seems to have been no present necessity for such a provision; and this circumstance, coupled with the provision quoted from the Consolato, leads me to believe that the provision in the statute of George II. was simply declarative of the then existing law of England. I am confirmed in this belief by my inability to find any reported case where the courts of England have been called on to construe or give effect to the provision referred to. It seems highly probable that the courts would have been resorted to for the purpose of ascertaining the scope and effect of these provisions if they had been new.

It is doubtless, therefore, correct to say that, by the law of England, as well before as since the statute of George II., seamen's wages are exempt from attachment. If the answer in this case is good, therefore, the law of the United States upon this subject must be at variance with the law of England, France, and probably of most other maritime nations. I have been unable to discover any good ground for supposing that any such variance exists. Indeed, the statute of the United States, passed June 7, 1872, renders it impossible to contend for any such variance, unless it be in regard to a part of the coastwise trade. The provision of the act of June 7, 1872, (now section 4536, Rev. St.,) is as follows : "No wages due or accruing to any seaman or apprentice shall be subject to attachment or arrest from any court." This provision, of course, ends all controversy if it is applicable to the present case. But the claimants insist that it is inapplicable to the libellants' wages because of the subsequent act of June 9, 1874, (18 St. at Large, 64,) which declares that none of the provisions of the act of June 7, 1872,

shall "apply to sail or steam-vessels engaged in the coastwise trade, except the coastwise trade between the Atlantic and Pacific coasts." When it is considered that the well-known mischiefs aimed at by the act of 1874 had no relation whatever to the provision in the act of 1872, reproduced in section 4536, the language of the act of 1874 affords room to argue that it was not intended to affect the provision of section 4536. Section 4536 declares a privilege in favor of the seaman as against his creditors, and, not being a provision of a character to be applicable to the vessel, may, perhaps, without much difficulty, be held to be unaffected by the act of 1874. Certainly the language of the act of 1874 is ill adapted to convey the idea that it was intended to create a discrimination in the matter of exemption from attachment against seamen who have served in the coastwise trade. No foundation in reason for such a discrimination has been discovered, and it would be unjust. The act of 1874 was, no doubt, passed without reference to its effect upon that provision contained in section 4536. It had an entirely different purpose, and I am by no means certain that it would be going beyond the bounds of proper construction to hold that it has no effect upon the provision of section 4536. "Statutes are to be construed according to the intent of the makers, if this can be ascertained with reasonable certainty, although such construction may seem contrary to the ordinary meaning of the letter of the statute." *Bigelow* v. *Maynard,* 4 Cush. 316.

But if such a construction cannot be given to the act of 1874, at most the act has simply the effect of a repealing statute. The question then arises whether the exemption declared in the act of 1872 did not exist in the law of the United States prior to the passage of that act? The answer to this inquiry seems to be indicated by what has been already said. If I am correct in the conclusion that such an exemption has always existed upon the continent as well as in England, it is not hard to say that the law of the United States is the same. For while, as was observed by the supreme court of the United States in the case of *The Lotta-wana,* 21 Wall. 572, the maritime law is only so far opera-

tive as law in any country as it is adopted by the laws and usages of that country, it still remains true that "foreign jurists and ordinances are familiarly quoted as   *   *   *   credible witnesses to prove what the marine law is." *Ware,* J., *The Elizabeth and Jane,* 1 Ware, 39. And, in the absence of any good reason to the contrary, it is incumbent upon the courts of this country to adopt, as far as may be, those rules that have been generally adopted by other commercial nations, and which are referred to as constituting "a sort of common law of the sea." *Ware,* J. Especially is this true in respect to a rule like the one under consideration, resting, as it does, upon considerations of public policy certainly as weighty in this as in any other country, and against which there exists no current of decision. I find, therefore, in the Consolato, the French ordinances, and the law of England, good ground for the opinion that by the maritime law of the United States the wages of seamen are not subject to garnishment at the instance of a creditor of the seaman in an action at law. This conclusion is aided by the presence in the act of 1872 of the provision already quoted, for at the time of the passage of that act there was no present necessity for such a provision.

A few—very few—cases of attempts to attach the wages of seamen are to be found scattered through the reports, but I have not been able to find any case where the attempt was successful. So far as the fact goes, it may be truly said, I think, that seamen's wages have been for the most part exempt from attachment in this as in other countries. It cannot be gathered either from debates in congress, the reported cases, or the practice of the maritime community, that any mischief existed which gave rise to the provision in question in the act of 1872. It is therefore fair to conclude that the provision was simply declarative of a rule which had been adopted by the usages of this country from the laws of England and the continent, as unquestionably are several other provisions standing in immediate connection with this one in the statute.

But aside from the provision in the act of 1872, or the rule

of the general maritime law, there are reasons to be found in the provisions of the act of July 20, 1790, (now sections 4530, 4546, 4547, of the Revised Statutes,) which strongly sustain, if they do not compel, the conclusion that seamen's wages are exempt from garnishment in an action at law. The act of 1790, which, so far as it is reproduced in the above-mentioned sections of the Revised Statutes, is wholly unaffected by the act of June 9, 1874, provides that "as soon as the voyage is ended, and the cargo or ballast is fully discharged at the last port of delivery, he (the seaman) shall be entitled to the wages which shall then be due." This provision is absolute. There is no exception in the case of service of an attacement. It does not say the seaman or his creditor. But the statute proceeds, (section 4546:) "Whenever the wages of any seaman are not paid within 10 days after the time when the same ought to be paid, or any dispute arises between the master and seaman touching wages, the district judge of the judicial district where the vessel is * * * may summon the master to appear before him to show cause why process should not issue against such vessel, her tackle, apparel, and furniture, according to the course of admiralty courts, to answer for the wages." Section 4547. "If the master against whom such summons is issued neglects to appear, or, appearing, does not show that the wages are paid, or otherwise satisfied or forfeited, and if the matter in dispute is not forthwith settled, the judge shall certify to the clerk of the district court that there is sufficient cause of complaint whereon to found admiralty process, and thereupon the clerk of such court shall issue process against the vessel, and the suit shall be proceeded on in the court, and final judgment shall be given, according to the usual course of admiralty courts in such cases."

By this provision every seaman is given a statutory right, in every case of subtraction of his wages, to have the master of the vessel summoned to show cause why process should not issue against the vessel, and jurisdiction is given to the district judge of any district where the vessel may be to so summon the master. It is difficult to see how the district

court can be ousted of jurisdiction to issue the summons thus prescribed, by an attachment issued at the instance of a creditor of the seaman in an action at law. But the statute goes further, and declares that the vessel shall be forthwith seized unless the master show that the wages have been "paid or otherwise satisfied or forfeited." An absolute and statutory right is here conferred upon the seaman to have the vessel seized and sold in every case where the master omits to show that the wages have been paid or otherwise satisfied or forfeited. Surely it is straining language to say that proof of service of an attachment upon the ship-owner at the instance of a creditor of a seaman would show that the wages had been paid or otherwise satisfied or forfeited, within the meaning of the act of 1790. Still further, the statute declares that any dispute between the seaman and the ship-owner touching the wages shall be determined according to the course of the admiralty, unless the seaman elect to bring his action at law. Is it possible that the seaman can be deprived of the right thus conferred by a statute of the United States, by the act of his creditor in causing an attachment to be served upon the ship-owner? Yet such must be the result, if wages are subject to be attached by process from a state court. Such is the result claimed here, where it is said that this seaman, Hare, cannot proceed against the vessel for his wages, and cannot have his dispute determined according to the course of the admiralty, because one Eddy, a creditor, has, without his concurrence, commenced a suit for him against the owners, in the second district court of the county of Bristol.

Another provision in the act of 1790 may be referred to as bearing upon this same question. The act declares (section 4547) that "in such suit all the seamen having cause of complaint of the like kind against the same vessel shall be joined as complainants." This is a provision of statute made not only to save the ship-owner from being subjected to several suits by members of the same crew, but also to save the seamen the expense and delay attending several distinct suits. It is by virtue of this provision that in this proceeding not only

Hare but McCarty is a party libellant.   Of course, the attach-
ment issued at the instance of the creditor of Hare against
Hare's wages is no bar to the proceeding so far as McCarty
is concerned, and if this answer prevail these owners will be
harassed by two suits—one at the instance of Eddy, for
Hare's wages in the second district court of Bristol county,
and the other by McCarty here; and further liable, for aught
I know, to as many other suits as there were members of the
crew; while Hare must bear the expense of one suit and
McCarty of another, and this in the face of a statute of the
United States declaring that there shall be but one suit, in
which all the crew shall be joined as complainants.   These
provisions of the act of 1790 not only furnish strong evidence
that at that early day wages of seamen were understood to
be exempt from attachment, but they are wholly inconsistent
with the existence of a right on the part of a creditor to
attach a seaman's wages in an action at law, and therefore
seem to compel the conclusion that such attachments are not
allowed by the laws of the United States.

The same conclusion is arrived at from an application, to
the peculiar contract of the mariner, of the principles of the
common law invoked by courts of law in cases of garnishment.
Garnishment is said to be, in effect, a suit by the defendant
in the plaintiff's name without the defendant's concurrence,
and, indeed, in opposition to his will.   Drake on Attachments,
§ 451.   It is well settled that garnishment cannot have the
effect of changing the nature of the contract, and it does not
lie where its effect will be to allow a creditor of the principal
debtor to enforce a contract in a manner different from its
legal effect and the agreement of the parties. *Sawyer* v. *Thomp-
son*, 4 Foster, 515.   If these principles be applied to the sea-
men's contract, it will be found necessary, as I think, to declare
that the wages due a seaman constitute a demand of such a
character that the law forbids an attachment of them in an
action at law.

"The contract of hire for mariners stands on reasons pecu-
liar to itself."   *Ware*, J., in *The Elizabeth and Jane*, 1 Ware,
35.   One characteristic element in this contract is that, upon

grounds of public policy, the law has attached to it a lien upon the ship. This feature is deemed of such essential importance that an express agreement on the part of seamen to waive the lien will be disregarded. "Admiralty courts will withhold their sanction from such agreements, not only upon equitable considerations growing out of the improvidence and want of intelligence of seamen in their bargains, but also upon considerations of public policy." *Betts*, J., *The Sarah Jane*, B. & H. 414. "Every maritime nation has a deep interest in the protection and preservation of seamen, as a class of men of indispensable necessity for the purposes both of peace and war. Their preservation, therefore, for the service of the country, becomes an object of public policy." *Ware*, J., *Hutchinson* v. *Combs*, 1 Ware, 65. Now, it is obvious that the necessary result of a garnishment of wages in an action at law is the destruction of the seaman's lien upon the ship. The only result of the proceeding of garnishment is to secure a personal liability on the part of the garnishee to apply the money to the payment of the plaintiff's debt. That is the sole object of the proceeding. It has been said that garnishment is a compulsory assignment, accomplished by the process and similar in legal effect to a voluntary assignment of the debt by the debtor. But it is only the personal liability of the garnishee that can be so assigned. An assignment of his wages by the seaman himself does not transfer the lien. *The A. D. Patchin*, 12 Law Rep. 21. By a garnishment of wages no transfer to the attaching creditor of the seaman's lien upon the ship is effected. The lien is simply destroyed. The very act of the common-law court in acquiring jurisdiction to enforce the seaman's demand against the owner of the ship, puts an end to the seaman's lien. Where such is the necessary result of the garnishment, the proceeding will not lie, for it is not permitted by means of garnishment to deprive the defendant of the benefit of his contract. The case in hand directly involves the application of this principle, for here the ground taken is that Hare cannot proceed against the ship, and it will not be contended that Eddy, his creditor, can, in the second district court of the county of Bristol.

Says Chief Justice Taney: "The seamen as a matter of right are entitled to the process of the court to enforce payment promptly in order that they may not be left penniless and without means of support; and the right to this remedy is as well and firmly established as the right to the paramount lien. No court of common law can enforce or displace this lien. It has no jurisdiction over it, nor any right to obstruct or interfere with the lien or the remedy which is given to the seamen. *Taylor* v. *Carryl*, 20 How. 601.

Again: "Courts of law cannot undertake, by garnishment, to settle the equities between the parties in order to subject an equitable demand which the defendant may have against the garnishee to the payment of the defendant's debt." Drake on Attachments, 457. The contract of the mariner is an equitable contract, and it gives rise to equitable rights not capable of being preserved by a court of common law. One of these is the right to submit the terms of the contract to be scrutinized, and, if necessary, reformed, by a court of equity before it be enforced. This right the mariner may waive by electing to enforce his contract as it is, in a court of common law; but such a waiver cannot be effected against his will by the act of a creditor in attaching his wages. To permit that would be to deprive the seaman of a substantial right without any consideration. The reality and importance of this right of the mariner will be made to appear by referring to a few familiar passages selected out of many to the same effect. *Sprague*, J., says: The court "scrutinizes all contracts respecting seamen's wages in order to see that advantage has not been taken of their necessities, ignorance, or thoughtless imprudence." *The Bark Rajah*, 1 Sprague, 199. "In all maritime countries seamen are privileged to go in their own peculiar courts, whose course and form of proceeding are adapted to the direct and guileless character of the sailors." *Ware*, J., 2 Davies, 118, *The Betsy and Rhody*. A court of admiralty, "within its jurisdiction, acts upon the liberal, enlarged principles of a court of equity, and especially it does so in dealing with the contract between the seamen and owners." *Ware*, J., Id. "A court of admiralty it is certain will, in some

cases, give a remedy where a court of common law would not." *Ware*, J., Davies, 119.

If such be the privilege of the seaman under the law, it cannot be permitted to a creditor, against the will of the seaman, to submit his rights to be determined by a court of law in a proceeding where of course the ship-owner has the right to defend, and where he may set up, for instance, that the sailor had agreed that all differences in regard to his wages should be referred to the chamber of commerce or the court of common pleas of the city and county of New York, as was done in the case of *The Sarah Jane*, B. & H. 402; or that the owners, by the terms of the contract, have a set-off for the value of medicine furnished the seaman, as was done in *Harden* v. *Gordon*, 2 Mason, 559; or that the seaman had agreed that the wages should not become due until three months after the end of the voyage, when of course the ship would have gone to sea again, as in the case of *The Express*, B. & H. 608; or that the contract was in the form used by *The George Home*, 1 Hagg. 378, of which Lord Stowell said: "It would take me up a very inconvenient time to point out half the impertinences with which it is stuffed, and which it is high time should be corrected." A seaman would surely have great cause to complain of the law that would permit his creditor, against his will, to submit questions like these to a court of law, which, according to Lord Lyndhurst, can find "no principle by which a contract entered into by mariners is to be construed differently from those made by other persons." *Jesse* v. *Roy*, 1 Cromp. M. & R. 316. See, also, *Webb* v. *Duckingfield*, in this state, 13 Johnson, 390, and *Goodrich* v. *Peabody*, in the state of Massachusetts, 2 Dane, Abr. 462.

Furthermore, the contract of the mariners is a species of partnership, (Emerigon.) "It is not, indeed, a partnership as to all the effects of that contract, but as to some of its consequences." *Ware*, J., *Skolfield* v. *Potter*, 2 Davies, 401. "In the common sense and equity of the case, the crew and the vessel have a joint or partnership interest in freight, and, independent of positive regulation, special contract, or a usage that has the force of law, no distinction can be made

between the title of the crew to the freight and that of the vessel or owners. It is in its own nature as perfectly a joint or partnership interest as can be conceived. These opinions expressed are not new." *Ware*, J., *The Brig Spartan*, 1 Ware, 139. But it has been held that when a garnishee was sought to be charged on the ground that he was indebted to the defendant in respect of a partnership which had existed between them, but the accounts of which had not been settled, the proceeding could not be sustained. *Burnham* v. *Hopkinson*, 17 N. H. 259. Whether, in this present case, the freight earned by these seamen has been collected or not, we do not know. If the freight has not been collected, the seaman must lose his interest in it, if the garnishment of the owner's debt for the wages holds good. If it has been collected, it is held by the owners in trust for the seaman *pro tanto*. And, inasmuch as the trust cannot be enforced in the second district court of Bristol county, to uphold the attachment is to overthrow the trust. "Garnishment can have no effect to overthrow trusts." Drake on Attachments, § 454*h*.

In regard to the garnishment of a legacy, which is a sum of money payable out of the estate, subject to chancery jurisdiction, where the executor is treated as trustee of the estate for the benefit of those interested in it, it has been held to be exempt from attachment, because of the great inconvenience and manifest incongruity attending the application of the law of garnishment in such cases. "Seamen are emphatically the wards of the admiralty, and, although not technically incapable of entering into a valid contract, they are treated in the same manner as courts of equity are accustomed to treat young heirs dealing with their expectancies, and *cestui que trusts* with their trustees." *Story*, J., *Harnden* v. *Gordon*, 2 Mason, 541. The rights of seamen, by virtue of the contract of hire, are those of a *cestui que trust*, of a mortgagee, of a part owner of the freight. They have privileges, personal in their nature, conferred by the law and upheld everywhere upon grounds of public policy. Caumont, Dict. Droit Maritime, 677, title "Gens de Mer." If great in-

convenience and manifest incongruity attending the application of the law. of garnishment are reasons for exempting any demands from garnishment, those reasons are as weighty in a case of this as of any other character.   Says the court in *Hussie* v. *G. L. U. Congregation*, 35 Cal. 378: "If we admit that the equitable rights of the defendant can be reached in that way, we must go to the length of holding that our justice's courts can take cognizance of them, and must be called upon to ascertain and condemn them to the use of the plaintiff, however difficult the undertaking may be, and however inadequate the powers of those courts."   So here, if it be held that an assignment of the seaman's contract to his creditor can be effected by the process of garnishment, and the contract enforced for the creditor's benefit, by the second district court of the county of Bristol, we must go the length of holding that that court can scrutinize the contract and reforms its terms—can enforce the security attached to it, by process *in rem* against the ship—can settle the partnership account in regard to the freight.   This seems to be the inevitable result of upholding the attachment, and it is conclusive against the existence of a right to attach the wages by process of a court of law.

Having thus endeavored to show that seamen's wages, whether earned in the coastwise trade or otherwise, are not subject to garnishment at the instance of a creditor in an action at law, I proceed to consider the effect of the fact stated in the supplemental answer, namely, that in the suit brought by Eddy the state court arrived at the opposite conclusion, and directed that the libellant's wages be applied to the payment of Eddy's demand.   According to the claimant's contention, that adjudication of the state court is binding upon this court, and is conclusive of the claimant's right to a dismissal of this libel, so far, at least, as concerns the wages of the libellant Hare.   But such is not my opinion.   The adjudication of the state court in the suit of Eddy, although to be treated with all respect, is without binding effect in the present proceeding, and does not relieve this vessel from liability to the present proceeding.   The libellant was no party

to the suit in the state court, for he was never served with process, and never appeared.

The Old Colony Steam-boat Company, who were the garnishees in the state court, are not defendants here, for this is a proceeding *in rem* against the vessel. The Old Colony Steam-boat Company is simply a claimant in this proceeding, entitled to defend the vessel, because of the fact that the vessel when seized was owned by that corporation, but not liable to a personal judgment, unless upon a stipulation for value standing in place of the vessel, if such a stipulation has been given, of which the pleadings convey no information. The proceeding in the state court was also a proceeding *in rem.* When a defendant is not served with process, the proceeding by garnishment "is to be treated to all intents and purposes as a mere proceeding *in rem.*" Story, Conflict of Laws, § 549; Drake on Attachments, § 474. The validity of the judgment rendered by the state court depends, therefore, upon the question whether that court acquired jurisdiction over the thing proceeded against, namely, the libellant's wages. That question is open to be passed on by this court, because it pertains to the jurisdiction, (*Thompson* v. *Whitman,* 18 Wall. 457,) and it is disposed of by the conclusion already arrived at, that the garnishment of seamen's wages is forbidden by the law. In *Hastings* v. *Farmer* the validity of a judgment against an Indian was considered by the court of appeals of this state, and the court say: "Farmer was served, but the service was prohibited by law, and therefore illegal and void. It was no service, and the justice had no jurisdiction." In *Taylor* v. *Carryl,* 20 How. 583, a decree against a vessel seized by the marshal, but found by the supreme court of the United States to be exempt from seizure, was by that court held void.

Moreover, the answer under consideration does not state that the Old Colony Steam-boat Company has paid the libellant's wages to Eddy, the attaching creditor; on the contrary, the judgment of the state court has been appealed from. *Non constat* that the wages will ever be paid to Eddy. "Where it does not appear that execution has been awarded

against the garnishee, and that he has been called on or compelled to pay, it is not such a payment, merger, or discharge of the original debt as to be pleaded in bar." *Moriam* v. *Rundlett*, 13 Pick. 511. Here the plea is in bar, and upon the authority just cited must be held insufficient.

But, in proceedings like the present, the result of an abatement of the action is substantially the same as the result of a bar. At the termination of the voyage the seaman and the ship are in the same port at the same time; if his suit, then commenced, be abated, the value of the seaman's lien is reduced to a matter of mere chance, for, if the ship be allowed to depart, no one can say when, if ever, the seaman and the ship will meet again in port. The ship may never return, or, if she does, may prove to have meanwhile been condemned and sold in some subsequent proceeding *in rem.* In some actions at law the difficulty arising from a prior garnishment of the debt sued on has been obviated by permitting a recovery, upon the condition that the plaintiff pay or secure the debt of the attaching creditor. No such condition is possible in cases of seamen,—a class so necessitous that an advance of future earnings has become a rule of the merchant service,—and it is a rule of the courts never to require security for costs of them, wanderers although they are. In other actions at law judgment has been rendered, but execution stayed until the debt of the attaching creditor has been satisfied or secured. Such a course is impossible in this class of cases, for the ship cannot be detained at the wharf subject to judgment. These and other similar considerations, that will readily occur to the mind, serve to show the extent of the inconvenience and incongruity attendant upon the application of a rule that permits the garnishment of seamen's wages in an action at law.

In conclusion, I may add that the rule exempting wages from garnishment springs out of the sharp necessity which the nature of his calling casts upon the seaman when he leaves his ship. A seaman is compelled to be improvident. While at sea the ship is his house, and his daily bread he

must receive from the hands of the ship's master. His wages cannot be paid him day by day, but must be allowed to accumulate in the hands of an unknown owner. When the voyage is over he must at once provide himself with temporary shelter and with food, and for that purpose he must have money in his hand. Therefore it is that his wages are nailed to the ship, and therefore it is that, as in the ancient days of the Consolato, so now, the law is forced to declare that no man can be permitted to say anything or do anything to deprive the seaman of the right to demand his wages when he leaves the ship.

Upon these grounds the exceptions to the answer are allowed.